# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JADA ANN HAIR,** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | **Civil Action No. _____** |
| | § | |
| **RCJD MOTORS, LLC, d/b/a RICHARDSON** | § | |
| **CHRYSLER JEEP DODGE RAM,** | § | |
| **Defendant** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JADA ANN HAIR, Plaintiff in the above entitled and numbered cause, and files this, her Original Complaint, complaining of Defendant RCJD MOTORS, LLC, d/b/a RICHARDSON CHRYSLER JEEP DODGE RAM, and for good cause would show unto the Court as follows:

### A. Parties

1. Plaintiff JADA ANN HAIR is an individual resident of the State of Texas.

2. Defendant RCJD MOTORS, LLC, d/b/a RICHARDSON CHRYSLER JEEP DODGE RAM (hereinafter referred to as "Richardson CJDR" or "the Dealership") is a foreign limited liability company organized and existing under the laws of the State of Delaware. **Defendant may be served with process by serving its registered agent, CT Corporation System, located at: 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136.**

### B. Jurisdiction

3. The Court has jurisdiction over the lawsuit because the action arises under the Truth in Lending Act, 15 U.S.C. §1601, *et. seq.* Additionally, this Court has supplementary jurisdiction over the remaining state law claims because they form part of the same case or controversy and share a common nucleus of operative fact with the federal claims. 28 U.S.C. §1367.

### C.  Venue

4.  Venue is proper in this district under 28 U.S.C. §1391 (b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

### D.  Conditions Precedent

5.  All conditions precedent have been performed or have occurred.

### E.  Facts

6.  On or about April 12, 2022, Plaintiff Jada Hair purchased a 2012 Jeep, VIN No. 1C4AJWAG9CL169758 (hereinafter referred to as "the Vehicle") from Defendant Richardson CDJR for $25,540.22 for personal, family, or household purposes.  In order to memorialize this transaction, the parties entered into a Motor Vehicle Retail Installment Sales Contract, a true and correct copy of which is attached hereto as **Exhibit "A"** and is incorporated herein by reference (hereinafter referred to as the "RISC").  As part of the sale, Defendant also sold to Plaintiff a Mechanical Protection Plan for $3,500, and a Guaranteed Auto Protection (GAP) debt cancellation addendum for $800, which was included in the purchase price and began running at interest on April 12, 2022.  A true and correct copy of the Mechanical Protection Plan is attached hereto as **Exhibit "B"** and incorporated herein by reference.  A true and correct copy of the GAP policy is attached hereto as **Exhibit "D"** and is incorporated herein by reference.  Defendant represented to Plaintiff that this was a completed, final sale, that the loan through Westlake Financial had been approved, handed Plaintiff the keys to the Vehicle, and indicated that no further action was needed on the part of Plaintiff in order to purchase the Vehicle.  Defendant's salesman even gave Plaintiff a handwritten note thanking her for her purchase.

7.  Despite the fact that the parties had already entered into the RISC, Defendant also presented a Conditional Delivery Agreement to Plaintiff that was executed by the parties at the same time as the RISC.  A true and correct copy of this Conditional Delivery Agreement is attached hereto as **Exhibit "C"** and is incorporated herein by reference (hereinafter referred to as the "CDA").  Despite the fact that the dealership was having Plaintiff execute the RISC, and was representing to Plaintiff that the sale was complete, the CDA tells a much different story.  The CDA indicates that the dealership was not selling the Vehicle to Plaintiff at all, but merely allowing her to drive it around for 3 days while Defendant attempted to find financing on behalf of Plaintiff.

8.  Shortly after purchasing the Vehicle it began to leak coolant so Plaintiff returned it to Defendant's dealership on April 15, 2022, to have it repaired under the Mechanical Protection Plan sold to her along with the Vehicle.  On that date Plaintiff was provided with a loaner car to drive while the Vehicle was being repaired.  On April 22, 2022, Plaintiff returned to the dealership in order to be able to return the loaner car and pick up the Vehicle, which Defendant had indicated to her had been repaired.  At that point, the dealership informed Plaintiff that Westlake Financial had rejected the loan, and because of that the RISC was no longer valid.  Instead, the dealership had decided to enforce the terms of the invalid CDA.  Plaintiff demanded return of her Vehicle, at which point Defendant called the Richardson Police Department and had Plaintiff removed from the premises.  Defendant has failed and refused to return Plaintiff's property to her.

## F.  Truth in Lending Act Violations

9.  The Truth in Lending Act was developed in the 1960's to respond to a lack of uniformity in credit terms.  Section 1601(a) of Chapter 15 of the U.S. Code describes TILA as "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him…"  The purpose of TILA is to provide a uniform disclosure scheme so that consumers can compare credit terms and make more informed decisions, and to avoid confusion in the transaction.

*Richardson CJDR is a TILA creditor*

10.  TILA defines the term "creditor" as follows:

"The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initial payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement."  15 U.S.C. section 1602(f).

11.  The Official Commentary to Regulation Z proves that Richardson CJDR is a creditor. The Official Commentary give the following example as an entity which would qualify as a TILA creditor:  "An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for the

immediate assignment of the obligation to the bank.  The dealer and the purchaser execute the contract only after the bank approves the creditworthiness of the purchaser.  Because the obligation is initially payable on its face to the dealer, the dealer is only creditor in the transaction."  12 C.F.R. section 226 Suppl. I at paragraph 2(a)17(i).

12.  Defendant is a creditor pursuant to this Official Commentary example because the RISC made Plaintiff's obligations payable to Richardson CJDR.  (**Exhibit "A"**)  Further, Defendant is a credit under TILA because it identified itself as such in the RISC.  (**Exhibit "A"**)  Both the TILA statute and Regulation Z require the creditor in a transaction to identify itself.  The TILA statute states that the creditor in "each consumer credit transaction other than under an open end credit plan" must make a number of specific disclosures, including the "identity of the creditor required to make disclosure."  15 U.S.C. section 1638(a)(1).  Likewise, Regulation Z requires that the creditor in a closed end transaction disclose "the identity of the creditor making the disclosures."  12 C.F.R. 226.18(a).

13.  Defendant was a creditor for purposes of TILA in the transaction in this case because it identified itself as the Creditor-Seller in the RISC wherein it made the Federal Truth in Lending Disclosures.  (**Exhibit "A"**)  As such, Defendant identifies itself as the TILA creditor pursuant to 15 U.S.C. section 1638(a)(1) and 12 C.F.R. section 226.18(a).  By holding itself out on the RISC as the Creditor-Seller to whom Plaintiff as the Buyer was obligated to pay the Amount Financed and the Finance Charge, Defendant is the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence and indebtedness."  15 U.S.C. section 1602(f).

14.  The RISC signed by Plaintiff expressly lists Defendant as the creditor.  The RISC states that Plaintiff, as buyer, was required to make 72 monthly payments to Defendant, the creditor, in the sum of $561.33, starting May 27, 2022, which included a finance charge.  (**Exhibit "A"**)  Until that installment contract was assigned or canceled in a contractual manner, Defendant was the entity obligated to provide financing to Plaintiff on the terms provided for her purchase of the Vehicle.  Stated differently, Defendant was extending consumer credit to Plaintiff by the terms of the installment contract the parties signed.  Therefore, Richardson CJDR meets the statutory definition of a TILA creditor as stated in 15 U.S.C. section 1602(f) as a matter of law.

*Richardson CJDR violated TILA by use of the Conditional Delivery Agreement*

15.  The use of a separate spot delivery agreement proposing to modify a fully integrated installment sales contract by creating a condition subsequent undermines the purpose of TILA as consumers cannot comparison shop for credit.  The use of a separate spot delivery form to attempt to modify what appears to be an extension of credit makes the consumer unable to determine just what credit terms are being offered.  Such an agreement violates TILA.

16.  Defendant violated TILA because the CDA rendered the TILA disclosures on the RISC illusory.  The RISC was not completed as to all essential provisions because at the time Plaintiff signed the RISC, Defendant considered the Truth in Lending terms to be non-final and subject to change at Defendant's whim.  Hence, the credit terms were not completed at the time of consummation, were fictitious and illusory, and were completed, if ever, long after contract signing, depending upon whether Defendant chose to assign the buyer signed RISC to a third party, or chose to revoke the RISC and unilaterally change the terms to its advantage.

17.  There can be little debate that, taken alone, the RISC is a fully integrated contract that purports to be binding on both parties when it was signed.  (**Exhibit "A"**) The CDA is conditioned upon Defendant obtaining financing on the part of Plaintiff.  (**Exhibit "C"**) The language of the CDA directly contradicts the terms of the RISC, wherein the TILA financing terms were disclosed and Defendant is identified as the Creditor-Seller to whom payments are due.  The purpose of TILA would be frustrated if automobile dealerships were permitted to rescind the terms of an integrated automobile retail installment sales contact by use of a second, contradictory form.

18.  The RISC states, "By signing this contract, you choose to purchase the vehicle on credit according to the terms of this contract."  (**Exhibit "A"**) By contrast, the CDA states, "Buyer agrees to return the above-described vehicle on 15 APR 2022 no later than 1:00 o'clock ___ a.m. / ___ p.m. in the same or substantially the same condition as when the Buyer takes possession."  (**Exhibit "C"**) The representations in the Installment Agreement that Richardson CJDR is providing credit on the financing terms stated in the TILA disclosures section for the Plaintiff's purchase is rendered meaningless by the language in the CDA, permitting the dealership, in essence, to cancel the purchase.  *See Patton v. Jeff Wyler Eastgate, Inc.,* 608 F.Supp.2d 907, 915 (S.D. Ohio 2007)(use of a separate agreement to invalidate the terms of the installment sales contract violated TILA).

19.    Finally, the RISC signed by Plaintiff contains a merger clause, which states: "INTEGRATION AND SEVERABILITY CLAUSE.  This contract contains the entire agreement between you and us relating to the sale and financing of the vehicle."  (**Exhibit "A"**) The RISC does not reference or incorporate the CDA.  The terms of the RISC and the CDA are materially inconsistent, as discussed above.  The inconsistencies make it impossible to reconcile the two contractual documents and read them as a coherent single contract.  *See Salvagne v. Fairfield Ford, Inc.*, 794 F.Supp.2d 826 (S.D. Ohio, 2010)(finding TILA violation in analogous circumstance and noting that the RISC and separate delivery agreement contradicted each other in material ways which prevented the contracts from being read as one contract.).

*Richardson CJDR violated TILA Disclosures of Loan Term and APR*

20.    Defendant had Plaintiff sign the RISC on April 12, 2022 (**Exhibit "A"**), but as of April 22, 2022, Defendant was informing Plaintiff that her loan had been denied and would not be funding.  Not only can the dealer not charge interest before the proceeds were disbursed, but it cannot disclose the terms as if the financing had been disbursed as of the date the consumers drove away with the Vehicle.  Instead, under TILA the disclosures should be labeled as estimates because the starting date has not been determined and the precise annual percentage rate (APR) cannot yet be computed.  Regulation Z, which enforces TILA, requires the creditor to identify the disclosures as estimates when it does not have information necessary to make accurate disclosures.  *See* 12 C.F.R. §1026.17(c)(2)(i).

22.    In this case, the start of the first payment period was an indeterminate date, while the payment due dates were fixed in the contract.  As the finance charges stayed constant and the length of the financing was fewer days than if it started on the date of the disclosure, the APR increases from the rate initially disclosed, but by an amount as yet unknown to the creditor.  As seen in the first RISC, although the dealership didn't know when the financing would be complete, or whether or not it would even be approved at that rate, Defendant failed to disclose the TILA disclosures as "estimates," as required under the statute.  Therefore, Defendant has committed a TILA violation by failing to do so.

*Richardson CJDR violated TILA through Excess Insurance Premiums and Related Finance Charges*

23.  It is a violation of TILA for dealers to start the terms of various insurance policies from the date the consumer drives off with the car instead of the date the consumer becomes the owner – such as GAP, credit, and physical damage insurance.  Any insurance sold in conjunction with the sale should have a start date, not as of the date the car is delivered to the consumer, but as of the date the condition is met and the consumer becomes the vehicle's owner.  Premiums should be calculated based on the date title is transferred, not the date the car is delivered.  The consumer's policy should not cover damage to a vehicle when the dealer still owns the vehicle, and the consumer should not pay credit or GAP insurance for periods before funding is disbursed.

24.  As seen in the RISC, Defendant sold a GAP insurance policy to Plaintiff on April 12, 2022.  (**Exhibit "A"**)  The GAP policy shows a start date of April 12, 2022, and a financed amount of $800.  (**Exhibit "D"**)  This is also true for the Mechanical Protection Plan ($3,500)(**Exhibit "B"**).  Funding for the Vehicle, however, never occurred.  Therefore, it was improper for Plaintiff to be charged interest accumulation for these policies.

*Damages*

25.  Any creditor who fails to comply with any requirements imposed upon it by TILA is liable to the consumer in an amount equal to any actual damages sustained by such person as a result of the failure, plus twice the amount of any finance charge in connection with the transaction. 15 U.S.C. §1640(a)(1)(A)(i).  Plaintiff suffered actual damages due to Defendant's misrepresentations of the financing terms, which lead to Defendant illegally taking possession of her Vehicle, and the forfeiture of her $2,000 down payment.

## G.  Violations of the Texas Debt Collection Act

26.  The Texas Debt Collection Act, Tex.Fin.Code §§392.001-392.404 (hereinafter referred to as the "TDCA") is a statute designed to protect consumers from harassment, false threats and unfair practices by creditors and debt collectors.

27.  The events giving rise to this lawsuit resulted in a "consumer debt" as contemplated by the TDCA §392.001(2) because Plaintiff sought to purchase a vehicle for personal, family, or household purposes and engaged in a transaction with the Defendant to that end. At all times

relevant to the claims made herein, Defendant was a "creditor" as defined under the TDCA §392.001(3) because it was a party to the car sale transaction.

28. The TDCA §§392.001(5) and (6), respectively, define "debt collector" as a person who directly or indirectly engages in "debt collection," which means an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor. At all times relevant to the claims made herein, the Defendant was a "debt collector" and engaged in "debt collection" under the TDCA because the Defendant sought to collect from Plaintiff alleged amounts owed resulting from the car sales transaction.

29. Through its actions above, Defendant violated the Texas Debt Collection Act sections:

a. TDCA §392.301(a)(6), threatening to file a charge, complaint, or criminal action against a debtor when the debtor has not violated a criminal law; and

b. TDCA §392.301(a)(8), threatening to take an action prohibited by law.

30. By virtue of the TDCA §392.404(a), a violation of the TDCA is considered a deceptive trade practice under the DTPA. Therefore, Defendant's actions in violating the TDCA are actionable by and through the DTPA. Plaintiff suffered actual damages as a result of Defendant's violations of the TDCA, and Defendant is liable for these damages.

## H.  Texas Deceptive Trade Practices Act

31. The Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code §§17.41-17.926 (hereinafter referred to as the "DPTA"), is a consumer protection statute designed to protect against misleading and unconscionable business practices and to provide efficient procedures to secure such protection. The DTPA allows a claim where the plaintiff meets the definition of a "consumer" under the Act, the Respondent violates the Act, and the Respondent's actions were a producing cause of the consumer's damages.

32. On April 12, 2022, Plaintiff purchased a motor vehicle from Defendant. She put $2,000 down, and financed the balance by entering into the RISC. (**Exhibit "A"**) A RISC is an agreement to pay all or part of the cash prices of a motor vehicle in one or more deferred installments. *See* Tex.Fin.Code §348.001(6)(defining retail installment sales contract); Tex.Fin.Code §348.001(7)(defining retail installment transaction). A conditional delivery agreement gives a motor vehicle dealer time to obtain financing by selling the RISC to another company. Tex.Fin.Code §348.013 (regulating conditional delivery agreements). If the dealer is

unable to sell the RISC, then it must return any down payment to the buyer.  Tex.Fin.Code §348.013(g).  On April 12, 2022, Defendant signed a CDA with Plaintiff.  (**Exhibit "C"**)

33.  Often, car dealers want to obligate consumers to the deal but still retain the option to cancel.  The ability to cancel gives dealers an out if they are unable to locate a financial institution willing to purchase the credit contract.  Additionally dealers may have an in-house financing department that needs time to verify the credit information submitted by the consumer.  In that event, the dealer will want to cancel the sale if the information check reveals some problems. Defendant, as a dealership, knows very well that a Retail Installment Sales Contract may not be conditioned on the subsequent assignment of the contract to a holder.  This action is prohibited by the Texas Finance Code §348.1015(a), which states:

"CONTRACT CONDITIONED ON SUBSEQUENT ASSIGNMENT PROHIBITED.

(a)  A retail installment sales contract may not be conditioned on the subsequent assignment of the contract to a holder."

34.  Once the RISC was signed by Plaintiff, the transaction was final.  The intent of both parties to buy and sell the Vehicle was clear.  Both parties discussed the purchase of the Vehicle and agreed upon price.  Defendant presented the RISC containing the agreed upon terms of the purchase to Plaintiff for signature.  Defendant accepted the signed RISC from Plaintiff.  Therefore, there was a "cashable contract signed" between Plaintiff and Defendant.

35.  When Plaintiff drove the Vehicle off of the lot, ownership had to rest either with the Defendant dealer (**Exhibit "C"**) or with Plaintiff (**Exhibit "A"**) – ownership should not be in legal limbo.  Defendant structured this transaction to fully comply with neither of these scenarios. Instead, Defendant created a legal mish-mash providing the most benefit to itself.  Defendant intermingled and intentionally confused these two very distinct transactions by having Plaintiff sign both the RISC and CDA at the same time.

36.  In a condition precedent sale, the dealer is the owner of the Vehicle, and until the sale is finalized, the consumer's rights and obligations regarding the vehicle are those of a bailee, not an owner.  Rather than consistently retain ownership until the condition precedent has been met, Defendant treated Plaintiff as the Vehicle's owner for some purposes, although not for others. Until the condition precedent had been met, in this case the assignee (Westlake Financial) agreeing to purchase the RISC, no sale had occurred.  Plaintiff did not have title to the Vehicle, and Plaintiff

had not yet borrowed any money. Consequently, no finance charges should have been accruing. No proceeds had been disbursed, so no interest should have been charged on those proceeds.

37.   On the same day that Plaintiff signed the CDA, she also signed the RISC with Defendant (April 12, 2022). (**Exhibit "A"**) (**Exhibit "C"**) A CDA is void on the execution of a RISC. Tex.Fin.Code §348.013(c)(2). Therefore, the CDA was void upon signing. By executing a RISC and a CDA at the same time, Defendant represented that the two contracts conferred or involved rights, remedies, or obligations which they do not have or involve, or which are prohibited by law. *See* Tex.Bus. & Com.Code §17.46(a)(stating that false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are unlawful).

38.   Defendant has committed a DTPA violation by having Plaintiff sign two separate agreements at the same time that state very different versions of the same transaction. As seen above, the CDA that Defendant had Plaintiff sign at the same time as the RISC was void upon signing. This is a DTPA violation to present these two contracts at the same time as they are prohibited by law. This means that either the RISC or the CDA were false and misleading at the time that they were signed.

39.   By falsely representing to Plaintiff that Westlake Financial was going to finance the transaction, falsely informing Plaintiff that the financing had been approved, falsely leading Plaintiff to believe that the sale transaction was completed and finalized, presenting documents to Plaintiff that were false when signed, and changing the terms of the transaction after it was represented to already be final, Defendant violated:

a.      the DTPA §17.46(b)(2), which prohibits causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b.      the DTPA §17.46(b)(3), which prohibits causing confusion or misunderstanding as to affiliation, connections, or association with, or certification by, another;

c.      the DTPA §17.46(b)(5), which prohibits representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connections which he does not;

d.      the DTPA §17.46(b)(7), which prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or mode, if they are of another;

e.      the DTPA §17.46(b)(12), which prohibits representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

f.      the DTPA §17.46(b)(14), which prohibits misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction; and

g.      the DTPA §17.46(b)(24), which prohibits failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

40.    By committing the actions described herein, Defendant violated the DPTA §17.50(a)(3) which provides a cause of action against a person who engages in an unconscionable action or course of action, defined as an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.  Further, Plaintiff is entitled to recover mental anguish damages plus additional damages of three times the amount of mental anguish damages, as Defendant intentionally and knowingly violated the DTPA pursuant to Tex.Bus. & Com.Code §17.50(b)(1).

## I. <u>Fraud</u>

41.  A person is liable for fraud if the person makes a material and false representation, either knowing the representation is false, or making it recklessly without regard to its truth, with the intent that the victim rely upon the representation, and the victim relies upon the representation and suffers injury as a result.

42.  Defendant has committed the following acts upon which Plaintiff's fraud claims are based:

a.  Defendant informed Plaintiff on April 12, 2022, through the RISC (**Exhibit "A"**) that the parties had a final, cashable contract, that had been approved by Westlake Financial, that it was a done deal, and that the Vehicle belonged to Plaintiff.  In actuality, Defendant had not obtained final approval for the loan, and instead Defendant did not consider this to be a final sale but a spot delivery in which Defendant could unilaterally cancel the contract and request that Plaintiff bring the Vehicle back to the dealership;

b.  On April 12, 2022, Defendant had Plaintiff sign the RISC (**Exhibit "A"**) and CDA (**Exhibit "C"**) at the same time, despite knowing that the CDA was void upon the signing of the RISC.  Defendant did this in order to remove Plaintiff from the credit marketplace, and lock her in to the sale if the funding went through and Defendant was able to assign the RISC to a lender, while at the same time holding the CDA in case the funding did not go through;

c.  Defendant misrepresented to Plaintiff that the first RISC was "not a valid contract" after the dealership was unable to assign the first RISC to a lender, and that the only choice Plaintiff had was to surrender the Vehicle to the dealership.  This was not true, as a dealership cannot unilaterally void a RISC, and cannot condition a RISC on being able to assign it to a lender.

d.  On April 12, 2022, Defendant represented to Plaintiff, through the Mechanical Protection Plan (**Exhibit "B"**) and GAP (**Exhibit "D"**) that those policies would begin on that date.  That was a misrepresentation, as those policies never began.

e.  Despite not having the loan approved by Westlake Financial, Defendant did not list the TILA disclosures as estimates on the RISC.  (**Exhibit "A"**)

43.  Plaintiff suffered damages as a result of Defendant's fraud and the dealership is liable for these damages.  Because Defendant committed these acts with fraudulent intent, malice, and/or gross negligence, it is liable for exemplary damages under the Texas Damages Act, Tex.Civ.Prac. & Rem.Code §§41.001-41.014.

## J.  Fraud by Nondisclosure

44.  Defendant concealed from or failed to disclose certain facts to Plaintiff.  Defendant failed to disclose information to Plaintiff known to it regarding the conditional nature of the financing for the Vehicle at the time of sale, including the fact that Westlake Financial had only conditionally approved the financing for the Vehicle.  Defendant, instead of communicating that information to Plaintiff, attempted to hide that information in order to complete the sale of the Vehicle to Plaintiff.

45.  Defendant had a duty to disclose this information, as Plaintiff and Defendant had a special relationship which required said disclosure.  The fact that the financing had only been conditionally approved instead of this being a final transaction was material.  Defendant knew that Plaintiff was ignorant of the conditional acceptance of her financing, and that Plaintiff did not have an equal opportunity to discover it.

46. Defendant was deliberately silent when it had a duty to speak.  By failing to disclose the information to Plaintiff, Defendant intended to induce Plaintiff to purchase the Vehicle. Plaintiff relied on Defendant's nondisclosure to her detriment.  Plaintiff was injured as a result of acting without the knowledge of the undisclosed facts, for which Plaintiff seeks recovery of in this suit.

**K. Equal Credit Opportunity Act Violations**

47. In the typical car finance transaction at a dealership, the dealer uses the consumer's credit application and credit report to perform an initial evaluation of the consumer's credit.  This initial evaluation will be a factor in determining which finance companies that the dealer will contact, either though financing software or directly for approval.  These potential assignees will respond to the dealer indicating whether they would purchase the installment sales agreement, and at what terms.  Both the dealer and the potential assignees may end up obtaining a copy of the consumer's credit report in connection with this potential credit transaction.  Whenever any of these finance companies or the dealer takes an adverse action, various notice requirements are triggered under the Equal Credit Opportunity Act. ("ECOA")

48. The ECOA requires creditors and assignees to provide written notice of the reasons for taking any adverse action on the consumer's application.  *See* 15 U.S.C. §§1691(d), 1691a(e); 12 C.F.R. §1002.9.  The ECOA defines creditor as someone who "in the ordinary course of business, regularly participates in the credit decision, including setting the terms of the credit." Regulation B, which enforces the ECOA, defines creditor as "a person who, in the ordinary course of business, regularly participates in the credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates."  *See* 15 U.S.C. §1691a(e).  Defendant meets this definition.

49. Defendant did not provide any adverse action letter to Plaintiff when it decided to unilaterally cancel the RISC.  Therefore, Plaintiff is entitled to recovery of actual damages, plus punitive damages not to exceed $10,000, plus recovery of her reasonable and necessary attorney's fees.

**L.  Attorney's Fees**

50.  Plaintiff is entitled to recover reasonable and necessary attorney's fees for prosecuting this suit under Texas Business and Commerce Code §17.50(d).

51.  Plaintiff is further entitled to recover her reasonable and necessary attorney's fees pursuant to Tex.Fin.Code §392.403 due to Defendant's violation of the Texas Debt Collection Act.

52.  Defendant is liable to Plaintiff for attorney's fees under 15 U.S.C. §1640(a)(3) due to Defendant's violation of the Truth in Lending Act.

53.  Plaintiff is entitled to recover her reasonable and necessary attorney's fees under the Equal Credit Opportunity Act violation claims against Defendant, pursuant to 15 U.S.C. §1691e.

**M.  Demand for Jury Trial**

54.  Plaintiff asserts her rights under the Seventh Amendment to the U.S. Constitution and demand, accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff asks the Court to award a judgment against Defendant for the following:

a.  actual damages

b.  Award Plaintiff three times the amount of her actual damages and three times the amount of her mental anguish damages pursuant to the DTPA §17.50(b);

c.  Award Plaintiff exemplary damages for Defendant's fraudulent conduct;

d.  Award statutory damages to Plaintiff in the amount of $100 per violation of the Texas Debt Collection Act;

e.  Award Plaintiff twice the amount of any finance charge in connection with the transaction. 15 U.S.C. §1640(a)(1)(A)(i);

f.  Award Plaintiff $10,000 in statutory damages for Defendant's violation of the Equal Credit Opportunity Act;

g.  Award Plaintiff her reasonable and necessary attorney's fees incurred in bringing this suit under Texas Business and Commerce Code §17.50(d), Texas Finance Code §348.408,  15 U.S.C. §1640(a)(3), and 15 U.S.C. §1691e;

h.  Award Plaintiff her court costs and expenses;

i.  Award Plaintiff prejudgment and post-judgment interest at the maximum rate allowed by law; and

j.  Award Plaintiff all other relief, both in law and in equity, to which she may be justly entitled.

Respectfully submitted,

**Law Offices of Craig Zimmerman**

By:     /s/ R. Douglas Scott
R. Douglas Scott
State Bar No. 24002920
DScott@craigzlaw.com
3019 Medlin Drive, Suite 100
Arlington, TX 76015
(817) 719-8567
Fax:  (817) 382-5109

ATTORNEY FOR PLAINTIFF